Number 182061, Laura Baum-Holland et al. versus Hilton El Con Management, LLC et al. Thank you. Good morning. Good afternoon, Mr. Reparative. Good afternoon. Sorry. We would like to reserve three minutes for rebuttal. Will there be any other court? This is a case, this is a diversity claim under Article 1802, which is the general statute in Puerto Rico. In this case, things is alleged that El Conquistador incurred negligence when it failed to take necessary security measures to avoid foreseeable risks to his guest, George Holland, Mr. George Holland. On the Article 1802. Sir? Excuse me? Can I save you some time? Sure. I would like to ask you, can we take judicial notice of the debt between the two islands involved here? The debt between Palomino and Palomino varies. Pardon me? It varies. It is not a one-level debt. It varies. At the point where Mr. Holland was identified as having some sort of problem, where the initial drowning event was recognized, there was not, Mr. Holland could not reach the bottom of the ocean. It was a depth approximately between 10 and 12 feet. So at the point that Ms. Jason, which was one of the party members with Mr. Holland, who was snorkeling, I should say, from Palomino to Palominito, noticed that Mr. Holland was having some sort of problems, no one could reach the bottom. So nobody could prop him up. The court, the district court in this case, decided that there were no material facts at issue. And plaintiffs, Holland, argued that there are numerous facts at issue here that relate material facts that prevent the court from summary, disposing of this case summarily. Now, is there a chart of the area in evidence? There is a Google map from a satellite image of the area where the witnesses to the event with most knowledge, the Jasons, drew lines, excuse me, plotted points where they initially saw the victim, Mr. Holland, having problems, and where the eventual rescue carried out by Holland's own family members in a catamaran took place. So there is that in the record. Okay, thank you. Sorry for the interruption. Sure. So we were... Excuse me. Yes. Could you just help me to understand Dr. Connell's expert report? Because the district court honed in on that one statement about the weather forecast being in a completely different location, and it seemed that that may have been an out-of-context understanding of the rest of the report. Yes. Plaintiffs will first clarify that the National Weather Service bulletin issued for January 1st was presented not as proof that there were strong currents in the exact location where the events occurred, but to establish that El Conquistador should have been forewarned or should have known about the hazardous weather conditions that were about to develop in the region. And those conditions included increasing strong swells from the morning of January 1st until the next day, Wednesday, January 2nd. And those swells affected the channel between Puerto Rico and Culebra, or the island of Culebra, which is one of the passages, the Atlantic passages that the weather report refers to. But your question is about Mr. Connell's report. Mr. Connell's report considers that weather advisory, together with other information, in order to recreate what the conditions were between the island of Palomino and Palominito, where the snorkeling took place in this case. And through his report, he establishes, and in his deposition he develops, that there were three factors that affected the development of strong currents on that day in that particular area. One was the change in the tide. There was a decreasing tide at that time. The second factor was the wind. And the third factor were the swells. And the swells create a funnel, excuse me, the reefs that surround Palomino create a funnel effect, according to Mr. Connell's, which helped them develop, with the other two factors I just mentioned, currents that ran laterally, and they were considerably strong, according to plaintiff's expert witnesses, Mr. Marti, Mr. Alberto Marti, and Mr. Connell. Well, he said they were up to .9 knots, I think, is what he said. .09 knots would be the upper range of the estimate. I couldn't find any testimony as to how that compared to normal for that location or what. I have no idea from this record whether .09 knots is a lot, a little. Yes. The expert witnesses declared during the deposition, at least Alberto Marti did, who consulted with the oceanographer, Dr. Canales, and he declared in his second deposition that they were both surprised, they're both swimmers, they're both involved intimately with the ocean due to their professions, and they both declared that they were surprised at the strength of the current. So if we use their opinion regarding that matter, that would be what we have in the record regarding that. If the two experts were surprised at the strength, how does that help you? Because you're saying that the defendant should have been aware of the strength. Well, yes, there was a weather advisory, and El Conquistador ignored it. They did not give any advice to their guests. They did not provide any warnings. They did not take any special measures in order to attend the foreseeable hazard risk, a latent risk because it's not evident, you don't see currents. And the defendant's own expert witness, Mr. Jenny Craig, stated that if there are latent risks, the owner of the premises, the person that controls the premises, should warn about those latent effects. That's the standard of care. Why is the ocean a premise of the hotel? That's a good question, Your Honor. It's not owned, but it is an activity that the hotel promotes actively, and it generates revenue from, and it induces for its guests. It has a flag-warning system, and the purpose of the flag-warning system in El Conquistador is precisely to warn the guests about possible risks. Excuse me. What was the testimony concerning the current that witnesses claimed? Was it .09? .09. That's nine hundredths of a knot? No, excuse me, .9, .9 knots. So it's nine-tenths of a knot. I would say it's just under one knot. Just under one? Yes, .9. Under one knot, and the witnesses testified that that was an unusual amount of current? Less than one knot? They were surprised. They were both surprised. One of them does triathlons, and the other is a lifeguard. And they were both surprised, and they had some sort of, they were not questioning about how that compares. You have an expert testimony to the effect that less than one knot is an unusual amount of current? No, we don't have that expert testimony. Well, why is less than one knot something that created an unusual danger? Well, one of the rescuers, one of the people that tried to rescue Mr. Holland in the ocean, Mr. John Rosado, who's perhaps the person with the most knowledge about the weather conditions there, said that the currents were very strong. Whether or not the .9 knot is empirically dangerous or not compared to other values, we don't have that information. But we do have plenty of testimonial evidence to the effect that the currents were strong. And Mr. John Rosado stated that they were really, they had a lot of trouble trying to rescue Mr. Holland, although he's not a lifeguard. But your foreseeability. Yes. Opposition is tied to this weather bulletin. Yes. And so are you saying that because of the weather bulletin that, number one, it necessarily meant that this particular area was impacted, contrary to what maybe Dr. Canales was saying. But, number two, because of the bulletin and because it impacted the area in question here, that they should have been on notice? Yes. I mean, so everything is tied to this weather bulletin. Well, they have a flag system in Palomino, as Conquistador did. What triggers the warning? Is it a weather bulletin or is it some other information? Did this come up in discovery? What causes them to change the flag coloring? You know, it's like something, what struck me about this is if this was a highly unusual, dangerous condition, you would think people would be coming out of the water saying something, and then they'd be, the heck with the weather notice from miles away, that they would see, it was evidence that they saw something or evidence that people told them. But otherwise, you have an expert who says the upper range was 0.9 knots. Many of us, I think, are wondering, it's hard to remember when I've been in the ocean and it wasn't close to that. So you're wondering, what's your case? Well, the case is that two days later, on January 3rd, they raised the red flag with exactly the same weather conditions, or even lesser. It was 0.9 knots when they raised the red flag two days later? Or less, because the swells and the tides were different. Well, do you have expert testimony that says what the knots were when they raised them two days later? No, we don't. We only have evidence that a red flag was raised. But what caused them to raise it two days later? That's a good question. We have not been able to get from El Conquistador what are the parameters, what are the guidelines that they used for raising a red flag. But that's too late now. You've done with the discovery. There's no 56 DEF affidavit, or there's no issue on appeal that the judge denied your discovery. So you just don't have it. We don't have that, but we have the evidence that it was raised, and the conditions, according to the National Weather Service, were less. The conditions away, you don't have evidence that the conditions were less at this site? Yes. That is the testimony of Mr. Calais. In the water right off the hotel? Well, it is the water between Palomino and Palominito, not next to the hotel. Where did we find that evidence that two days later the water was less and a red flag was up? There was a pro-offered National Weather Service bulletin that was excluded by the district court. But that wasn't for this little area, was it? It was for the whole region, and the whole region is affected by large swells. And as a matter of fact, Mr. Calais testified in his deposition that he was surprised about the change that occurred on that day, that the swells were coming from the northeast and they changed directly north. And as I stated earlier, they were both- But the district court excluded it, and if you haven't appealed that exclusion, we can't consider evidence that has been excluded from the record. You could take judicial notice, Your Honor. It is a document that is readily available, and we would submit it for the court's consideration. I have two questions. One is, does the record show the distance that your client would have had to swim between Palominos and Palominitos? 0.6 kilometers, it shows it. 0.6 kilometers? Yes. Okay. The second question is, was your client aware at the time that he had a heart condition before he engaged in this activity? There's no evidence in the record that he had a heart condition or that he was aware of it. There's no diagnosis to that effect, and there's no medical record that establishes that. That is the conclusion of the attorney for El Conquistador, and the cause of death- He was a doctor. He was a physician. He was a radiologist. And the coroner unambiguously stated that he drowned. There's no controversy about the cause of death except in El Conquistador's position. Now, does the record show if someone has a heart attack, the process of swimming, can he then drown? Yes, that is something that could happen. A heart attack cannot be excluded, but there's simply no evidence of a heart attack in this case. Not by the coroner and the cardiologist that- I was under the impression somewhere in the record there's something about him having a heart attack. The issue was whether that was a cause of death. That is a controversy that has been repeatedly brought up by El Conquistador. Nevertheless, the coroner and plaintiff's expert witness and cardiologist will establish otherwise, that this was a drowning, and there's absolutely no evidence in the record that Mr. Holland died from a heart attack. That's one of the numerous interjections. You don't need to establish that there's no evidence in the record. You're on Rule 56, right? Correct. So you're just saying that at worst, even if they had some evidence, we need to look at your evidence for Rule 56? Precisely. And there were many, many presumptions or inferences that were adverse to the plaintiffs in this case throughout the 105 Statement of Uncontested Material Facts, which were in reality contested. What's your causation evidence for your- because I can see if the claim was they should have stopped people from going in the water, then you'd have a causation case. Yes. Well, the causation evidence is the fact that if there had been a red- if El Conquistador had taken the necessary measures that plaintiffs are alleging, such as advising, warning, providing lifeguard, providing life-saving equipment, having available life-saving equipment, there's an important- See, that's where- having available life-saving equipment. I couldn't find in this record any testimony that if there had been some life-saving equipment on the beach, it would have made a difference. There's no evidence to that. Well, there are- Where I can see that if the theory is that they shouldn't have been in the water at all, then you've got causation. There is evidence in the record that the patient- excuse me, that Mr. Holland was alive at the time that he arrived to the beach. And the evidence would be presented- No doctor has said that if we'd got to him, you know, 30 seconds sooner, he would have survived. That is something that was going to be brought to the jury because- Going to doesn't do it for you. You've got to show on this record you get the benefit of any competent evidence you put in, but you have to be some competent evidence at the Rule 56 stage that would allow a jury to say that. It's a medical issue. So I looked through. I could not find in your brief any mention of any medical testimony that had they done something, got to him sooner, it would have saved his life. The medical testimony was not presented, but the testimony of two physicians that were related with the whole incident, Mr. Baum and Ms. Laura Holland, physicians, they testified that the patient was- excuse me, Mr. Baum stated that he had a pulse and he had faint- Sure, but even then they weren't able to save him. We don't know what would have happened if adequate care had been provided. That's the problem. So you lose on causation unless you've got a theory that says he wouldn't have even been in the water. Then you win on causation. And I don't- I'm trying to see what that theory is. Could you restate your question, please? Sure. When you say we don't know whether he would have survived or not had they got to him sooner, that's a way of saying that this case shouldn't go to the jury on whether he would have survived if they got to him sooner. But if you had a theory that he never would have been in the water, then that gets you to a jury on causation. But that is one of our allegations. And the record of the complaint- But when I asked it last time, you started saying they should have had all this safety equipment on shore, they should have had- well, that doesn't keep them out of the water. That just means they get to him faster. But the first argument that we made is that they should have stopped all kind of activity on that day. That was the first argument. Don't you have an assumption of risk problem in this case? Well, the fact- Didn't he sign a document saying he assumed? No, he did not. He did not? He put his signature on a form that is an inventory form. The person that attended the kiosk, Casa del Mar, that was in charge of attending to Mr. Holland and his party, stated that she normally would highlight the part of the document that could be interpreted as a release, and that she did not do it in that case, and that she would give that to the persons to read. Excuse me. What does the document say that he signed? An inventory sheet. As a matter of fact- But doesn't it say something about assuming risk? The top- we don't know. We don't know. We do not know. Please say yes or no. I'll take your answer for the purpose of this argument. If the document stated that the activity was at its own risk- Yes. In very small letters that we don't know if Mr. Holland ever read or was informed about. According to Ms. Morgan's testimony, after she wrote the George, because according to El Conquistador, he printed his name, which he did not, and then signed the document. Ms. Morgan said that after she took the information regarding the fence, the mask, and the snorkel, the numbers, she wrote it in that inventory part of the document. She wrote George, and she gave it to him in order for him to sign. No, she did not follow what she said was her normal procedure. Did he sign it? He signed the inventory sheet. So the document evidence is signed by him, and it contains something about assuming risk. The rest is argument, which I think is valid argument, but that's not the question I asked. He put his signature there, but we, the plaintiffs, do not accept that he presented informed consent, and that is one of the requisites in law in Puerto Rico for a release. The Olivelli case was decided under maritime law and used federal policy, public policy, in order to reach its determination. In Puerto Rico, the public policy demands, excuse me, statutory dispositions in the Civil Code state that when a person signs away a right that is provided by law, it has to do so without it being contrary to public policy, among other requisites. And public policy in Puerto Rico states that those sort of negligence exclusionary agreements or a priori negligence denials are not allowed or should be, pardon me. You're ten minutes over your time, so please come to an end. Strictly construed against the party relying on them to avoid liability. The agreement exempting them from liability for negligence are not favored by the law. That's public policy, and the language has to be clear, conclusive, and equivocal, and the language in this alleged liability could not be more confusing. It actually talks about negligence by other snorkelers, and as I stated earlier, there is no evidence in the record that Mr. Holland actually read the part of that compound document which has a medical history part, it has a release part in very small letters, and then the primary part of the document is comprised of an inventory sheet. Thank you. Mr. Robles, you're on. Good afternoon. Should I wait, Your Honor? Pardon me? For the person who left the room, you want to wait? The person that left the room? I misunderstood what you said. I'm sorry. Good morning. My name is Ira Fernandez. I'm sorry. I was reading from the wrong document. Okay. Thank you. It's late in the day. No problem. Good afternoon, Judge Thompson, Judge Torrilla, Dr. Kayata. I am representing Zurich American Insurance Company in this case under the direct action statute, and my mission today is simple. It's to defend the trial judge from a brief that in 10 pages contained inflammatory language, derogatory, and the judge unfortunately cannot defend himself. So that's what I'm here for. I only ask for three minutes because it's the only issue that I'm going to bring, and I have it down to two minutes so that you guys will have a minute or more to ask questions if you choose to do that. The accusations contained throughout the appellant's brief, and I make that a part, the appellant's reply brief does not fall in that category because there was no accusation. However, in the appellant brief there are 10 pages that criticize with inflammatory words and baseless accusations the trial judge. I ask you, can I mention the trial judge's name? We know it. All right. It's not relevant. All right. Let me give you the three examples. At page 33 of appellant's brief, quote, the district court bent over backwards to help a conquistador.  That is that this judge did everything he could to help a conquistador, and that statement on its own is inflammatory, is derogatory. At page 30, the district court judge is criticized, and I quote, the reason for dismissal are, one, arbitrary, two, grossly distorts plaintiff's expert analysis, and worse than that, purposely the district court misinterpreted evidence, purposely. Again, there is an issue of an emotion working here that I have to come and defend the judge in this case, and I'll show you the third. Page 29 of the appellant's brief. The district court focused his attention only on matters presented by a conquistador. I believe that those three are sufficient to show you clearly how the district court needs to be defended against those words before you. I respectfully submit to you that all those wording in the appellant's brief is a personal attack that is unbecoming and is impermissible. In any event, it's important to point out that appellants waived the argument about an alleged misbehavior of the judge as an issue for reversal. If they were so concerned. Your time is finished. I'm sorry. Oh, I'm sorry. I was going to say thank you. Thank you. You can say thank you. Thank you. Mr. Colon. May it please the court, good afternoon, Your Honor. Good afternoon. Tony Francisco Colon on behalf of the remaining defendants. Because I only have 12 minutes, I will focus as to defendant El Conquistador Partnership, LPSE. As part of the motion for summary judgment, we had presented evidence, a sworn statement, that neither El Con operator or El Con management were involved in any way with the hotel and had not provided any services since before the incident. And that LXR, Luxury Resorts, Inc. did not exist. So moving on to El Conquistador. Regarding Your Honor's question about the distance between the, about the distance between Palomino and Palomino, it's about .6 kilometers, although the district court had, at footnote 12 of its opinion and order, it mentioned that it was about just under 1.1 kilometers. Regardless, the, if we go on to .6, we're looking at, to the extent that the complaint, the third amendment complaint, I believe it's paragraph 28, alleges that the incident happened about halfway between Palomino and Palomino, then we're looking at approximately 300 meters more or less. By the way, there was a question posed as to whether or not there was on the record a diagram as to the incident. There is not. There was one put to the, to witnesses in depositions or whatever, but in terms of the record to the court before the district court, and which this court has on review, the diagram is not in. Well, we have a little map where people have, someone has circled 1, 2, 3, 4, 5, 6, 7, and then a key going to each of those numbers that recites what happened to each of those events. Yes, and, yes, what I meant to. So for purposes of Rule 56, the plaintiff has proved what's on that map. Don't we have to assume that? Yes, and my comment is only intended as to a map with measurements of a distance. But, yes, there is a diagram in terms of the relative positions as indicating what happened where. Now. So if it's 300 meters, what do you say to the proposition that that weather advisory should have at least, you know, put a lifeguard there looking out to see if anyone was having any trouble? Well, Judge Thompson mentioned that perhaps there was a statement made by the district court characterizing Canals' testimony about the National Weather Service report, and that perhaps it was taken out of context, that it applied for a totally different area. But Canals, in fact, and that was its brief, in our brief, Canals explained that what the National Weather Service Bulletin did was forecast a wide area all along the north of Puerto Rico all the way to the Virgin Islands. And he, that is weather. Is this area in this? Well, generally, yes. But in terms of the ocean conditions forecast, Canals explained that, by way of example, there were forecast 7 to 9 foot swells with breaking waves of 10 to 14 feet and higher on shore. Yet Canals' own testimony is that the waves, actually he modeled the height of the waves using two models, but using the more accurate model, which was the BOUS2D, that led to an estimated wave height at or less than one foot. Now, that is very different from what is forecast. So Canals, at the deposition, and this is on the record, he was asked about this, about this difference. And he insisted on explaining, yes, because the Bulletin does not pretend to forecast the conditions in the Palomino, Palominito area. And he explained why they're so vastly different. North of Palomino, there's a ring of islands, Cordillera, if you will, that includes the island of Icaco and others. Additionally, south of that Cordillera, or range of islands, the bathymetry, or the bottom of the ocean, changes. And there is, in fact, to the northeast side of Palomino, Palominito, there was a big reef. So... Just to make things simple, what I'm trying to figure out is the weather bulletin. Yes. That was issued. Would that have caused El Conquistador to be on notice that there was the possibility of, you know, bad waves of weather that would have told them not to, or caused them to put up a red flag? Your Honor, I'm sorry. According to counsel, the record is devoid of information because you didn't provide it in discovery, and the district court didn't compel its production. As to why and what caused the red flag to go up two days later. Well... And we still don't know what causes the hotel to, at times, put up a red flag, and at times not. We don't know what triggers it. Actually, there was deposition testimony. What triggers it? Well, there is an assessment. There was deposition testimony wherein it was explained that the position of the Palomino Island Manager, that's a position of someone at the hotel, they would make the call based on the weather conditions as they observed them that day and the information available to them. And there was also a... It's also in the deposition testimony of this person that they would check weather sites and examples of the weather sites were checked, were given, for example, weather on the ground and others. That testimony is there. Now... Do they rely on these bulletins in any way? Well... Again, going to Canel's explanation, the weather service... That's their expert. Does your client rely on these bulletins? Well, when the bulletin is forecasting, which by its definition and its description, it's forecasting an area exposed to the North Atlantic and it does not show conditions in Palomino, Palomino, then they're going to base their judgment on the information that they have pertaining their particular area. Above and beyond what a forecast from the west coast of Puerto Rico to the Virgin Islands on the northern exposed coast may say. Could you just answer, do they see the bulletins? I mean, I understand that you're saying that they base it on other information, observation, probably people reporting, but do they use these bulletins in any way? They use weather bulletins, Your Honor, but to be frank, in terms of this particular bulletin, the answer to your question, I don't know. The weather bulletin here, one of the problems we have is to this day, I still don't know where that weather bulletin came from. At the page two of the weather bulletin, at the bottom, it has a URL, www.weather.gov backslash San Juan. But if you access that URL address, you don't ever get to the bulletin. And that was part of the evidentiary objection we raised, that there was no indication as to the provenance of this document. This is a document that was not produced in discovery by the weather service. This was a document that was produced to us as an initial disclosure from the plaintiff. So we argued that it was not admissible, and of course, we argued in terms of a, we argued our case on the assumption that it was admissible, but to this day, we don't know where that document came from. To be more specific, when we talked about the information that the hotel relies on, that's going to include the information available on weather sites, and that's going to include the actual perceptions of the dive masters who operate the boats, because every morning before Palomino opens, there's at least one run to take, on the El Conquistador ferry, there's one run to take employees to their stations at Palomino Island. And the dock master who runs the ferries with his ferry captains, they discuss the weather conditions. They actually see them. So is there something in the record where somebody was specifically asked, on the day this incident occurred, how did the hotel assess the ocean conditions between these two places that day? Is there something in the record that you can point us to? No, they did not ask those questions, or they did not depose the person who actually put up the flag that day. So the answer to your question is no, the record does not have that evidence. And I didn't ask about the flag that day. I asked about is there anything in the record where someone was directly asked how the weather was assessed on the day of the incident, because we know there was no flag that day. To answer the question specifically as to the weather that day, there's no evidence on the record. There is evidence on the record that as a matter of practice, the Palomino Island manager would assess, based on the information available to him, weather sites based on what's happening with the, or what's relayed by the dock master and the ferry captains. And in fact, the Palomino Island manager takes that ferry on the way over. So he will actually experience the ocean conditions as well. That's in addition to looking up whatever bulletins or publications are available on known Internet weather sites. Was there any evidence as to how many people went in the water that day? Not that, well, in general terms, no, but there is evidence how many people rented snorkeling suits and snorkeling gear that day. At Exhibit 54, which is... And how many, what approximately, how many? Roughly, ballpark. There were at least, there were over 30 people who rented snorkeling gear that day. Was there any reports or evidence that anyone else had any difficulty that day? No, and that's part of the argument we make, that of even Holland's group, and to be more specific about the snorkeling group Holland was a part of, seven people, including two minors, one who was 14, one who was 10, Mr. Larry Jassin, in his deposition, and that deposition was submitted and it's on the record before the district court, he had testified that no one had problems, that neither he, his wife, Holland, or anyone else in the party that he knew of, had any trouble swimming along the snorkeling route. Second, Lisa Jassin, when she sees Holland for the first time, because she felt like mother hen and she lifted her head above the water, she looked at the group, saw Mr. Holland, he sees him, calm, treading water, looking at Palomino, not thrashing, not struggling, just calm, treading water. And in fact, she was asked, hey, were the, what she was asked, were there any conditions in the ocean that prevented you from staying afloat, that were, you know, waves breaking over you, a current pulling you under? She said no. And to further drive the point home, she was asked, did you ever consider, were the ocean conditions ever such that you considered turning back, given her mother hen role? May I finish the thought? Finish. Okay. Given her mother hen role, were there any conditions that led you to believe you should turn back, considering you had two minors with you? No. So not only did none of the other people who rented snorkeling gear that day ever mention anything, not even the people in Dr. Holland's group reported trouble along the snorkeling route. I know my time is up, but if there are any further questions, I'll be happy to take them. Thank you. Mr. Infante? Regarding whether or not there were any problems with any people doing the snorkeling, the same route that Mr. Holland did, we don't know because there's no testimony regarding the people that... Isn't there evidence that the two children reached the other side? They reached, but we don't know how, what difficulty, if any, they had. And Mr. Jason didn't say that he spoke to them or was aware if they had any problems. But there is evidence that they reached the other side. Yes, they reached the other side. Were they asked if they had problems reaching it? No, they were not deposed in this case. They weren't deposed. See, that could be a problem for you if we know that that entire day nobody reported any difficulties of any type. No one testified that the water looked like it was a problem. Instead, you're left with saying there's this weather advisory for a general area of wash off the coast and that it somehow was producing something that elicited no comments from anyone who was actually at the site. But actually, there were plenty of comments about the occurrence. There were comments by Mr. Larry Jason, by Ms. Lisa Jason, by Mr. John Rosal, by Mr. Baum. Did any of them say they had any difficulty swimming? They had difficulties, yes, they had difficulties swimming. Mr. Larry Jason said that he felt himself could be drowning if he did not get out of the water soon. There's testimony to that effect. Is this the .9 current we're talking about? Yes, at least. Thank you, that's all. Yes, so regarding whether the person that put up the flag was deposed or not, yes, he was. Mr. Inez, who was the island manager on that day, was absent. And therefore, the substitute, Stephen Morales, was asked about what were the parameters he followed in order to raise a flag or not. He did not know. So there was a deposition testimony from Mr. Rivas, excuse me, from Stephen Ramos, I forget his last name, but the island manager that was acting as sole on the day of the event was deposed. Regarding the bulletin, the bulletin is readily accessible and is part of Dr. Canal's expert report. And I invite any of you, I invite this court to try to access the report and you'll see how easily it is accessed. What bulletin are we talking about? Excuse me? What bulletin do you say is readily accessible? Just name it. I'm going to name it. Correct. It's an urgent immediate broadcast request from coastal hazard message by the National Weather Service, San Juan, Puerto Rico, at 5 a.m. AST, Tuesday, January 1st, 2013. How is this accessible? It's through a NOAA website, National Oceanic and Space Administration. Okay. That's at least how I access it. And regarding... Your time is up. Sorry. I'll take your case on the review.